[No. A078480. First Dist., Div. Two. Aug. 5, 1998.]

MADELINE HARRIS, Plaintiff and Appellant, v.
CIVIL SERVICE COMMISSION OF THE CITY AND COUNTY OF
SAN FRANCISCO et al., Defendants and Respondents.

**COUNSEL**

Michael S. Sorgen and Andrea Adam Brott for Plaintiff and Appellant.

Louise H. Renne, City Attorney, Vicki Clayton and M. Diane Weber, Deputy City Attorneys, for Defendants and Respondents.

**OPINION**

**LAMBDEN, J.**—This action is based on a claimed violation of the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.) (the FEHA) and poses the question, "Can a member of one protected minority group force her employer, through administrative mandate (Code Civ. Proc., § 1094.5), to use promotional tests which would benefit her but have a severe adverse impact on another protected minority group?" Our analysis of the law lead us to conclude she has no right to claim any benefit from such manifest adverse impact on the grounds that she may have her own claim of discrimination.

The FEHA permits use of a manifestly discriminatory test only if there is evidence of necessity based upon "job relatedness." Without being relieved of the duty to investigate other claims of discrimination, the employer retains the discretion to inquire whether the necessities of a particular job may justify reliance upon the results of an otherwise impermissibly discriminatory test. The employer may in good faith produce evidence to support such a contention. However, an employer is not required to attempt to justify the use of discriminatory tests and has no legal duty to do so arising from any asserted right of a member of another protected minority group to claim the advantage of such discrimination. To permit such a claim would turn the FEHA on its head.

## BACKGROUND

Madeline Harris, an employee of the San Francisco Municipal Railway (Muni), brought this action against the City and County of San Francisco (City) and, in one count, against the City's civil service commission (Commission). She sought writ of mandate, and damages and other relief, for alleged gender discrimination in the cancellation of civil service examinations and eligible lists on which she had placed number one.

The City charter vests the Commission with sole authority over examinations for City employment, including Muni. The Commission may delegate to the department of human resources (DHR) the offering of tests but retains ultimate authority to adopt any resulting eligible lists.

Under that authority, the DHR's public utilities commission examination unit administered tests in 1992 and 1993 for transit manager I and II (TM I & TM II) positions at Muni. Each test had a written component which had to be passed in order to participate in a second, oral component. The tests were given concurrently, and Harris, a White female, took both. She scored number one on both tests.

Subsequently, Transport Workers Union, Local 200, filed a protest with the DHR claiming the tests had an adverse impact on African-American applicants. This prompted a DHR staff review and analysis which showed: African-Americans constituted 45 of the 94 applicants who took the written TM I test and 39 of the 93 who took the written TM II test; 26 percent of men and 36 percent of women among them passed the TM I test, as compared with 73 and 75 percent of their White counterparts; and a similar disparity (26% and 38% compared with 67% and 71%) marked the TM II results. The men/women composition of the resulting tentative eligible lists was 28/12 for TM I and 32/10 for TM II.

The DHR attempted to reach a compromise, but this was rejected by the union. Ultimately, the DHR's human resources director (Director) canceled the tests and tentative lists, citing an adverse impact on African-Americans. Harris and four others who had been on the lists then appealed the Director's decision to the Commission, which considered the staff report and heard comments at a public hearing. The Commission ultimately upheld the decision, based also on adverse impact.

Harris then filed a complaint of discrimination with the Department of Fair Employment and Housing (DFEH), naming the "City & County of San Francisco (Civil Service Commission)" as the discriminating agency and stating that she had been denied promotion by the "Civil Service Commission" and its executive officer, "Albert Walker." She alleged, "[T]ests on which I placed number 1 were discriminatory toward minority groups who are represented in the 2 classifications in question in greater numbers than their numbers in the relevant work market while women are underrepresented." The DFEH declined action and issued her a right-to-sue letter in April 1995.

Her verified petition and complaint is in three counts. The first two, for traditional and administrative mandate (Code Civ. Proc., §§ 1085, 1094.5 (hereafter sections 1085 and 1094.5)), were denied by Judge William J. Cahill, who found the cancellation nondiscriminatory and supported by the administratively determined adverse impact on African-American applicants. The third count, for injunctive relief and damages under the FEHA, was decided by Judge David A. Garcia on summary judgment. He found failure to exhaust administrative remedies as against the City and, on the merits, no triable issue of material fact.

DISCUSSION

*Review by Administrative Mandate Is a Dubious Remedy*

■ Harris's challenge is to action by the Commission in refusing to adopt test results and tentative eligible lists produced by that agency, but she names the Commission only in her count for administrative mandate and, as she conceded at oral argument, seeks only relief against the City in her other two counts.

The City charter vests in the Commission, with DHR assistance, the exclusive power to develop and administer tests, and produce eligible lists, for civil service hiring and merit system promotions within the City, whether for Muni or for other City departments. (S.F. Charter, §§ 10.101 to 10.102;

*Social Services Union* v. *City and County of San Francisco* (1991) 234 Cal.App.3d 1093, 1099-1100 [285 Cal.Rptr. 905] [construing parallel provisions of the former charter].)

The record establishes that the City had no control over the tests' formulation or implementation, the resulting tentative eligible lists, or the ultimate decision whether to adopt or cancel them. The City simply never had the lists available for its use. Harris's counts based on traditional mandate and the FEHA are therefore directed against the wrong entity, and this moots subsidiary issues like whether she exhausted administrative remedies before the DFEH.[1] Her only hope for relief is found in her first cause of action, which petitions for administrative mandate.

We question, as the Commission does, whether review by administrative mandate is available. Unless (1) a hearing, (2) the taking of evidence and (3) discretion to determine facts are all required "by law" (§ 1094.5, subd. (a)), review can be had only by traditional mandate (*Anton* v. *San Antonio Community Hosp.* (1977) 19 Cal.3d 802, 814-815 & fn. 11 [140 Cal.Rptr. 442, 567 P.2d 1162]). Those three elements codify the essence of "adjudicatory function" (*Temescal Water Co.* v. *Dept. Public Works* (1955) 44 Cal.2d 90, 101 [280 P.2d 1]), as opposed to legislative or quasi-legislative function, in an administrative body.

 ██ ██ Neither Harris nor the dissent identifies any statute, rule, charter provision or civil service rule (see, e.g., *Mahdavi* v. *Fair Employment Practice Com.* (1977) 67 Cal.App.3d 326, 334-335 [136 Cal.Rptr. 421]; *Jean* v. *Civil Service Commission* (1977) 71 Cal.App.3d 101, 105-110 [139

---

[1]The City is the only entity named in the third cause of action, for sex discrimination in violation of the FEHA, and this raises a threshold question whether summary judgment was properly invoked. By the time the motion was brought, Judge Cahill had already denied the petition for writ of administrative mandate, thus disposing of the only cause of action against the Commission and leaving only the City in the action. A "NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT FOR DEFENDANT" filed by the deputy city attorney, who had been jointly representing both defendants, stated: "[D]efendant CIVIL SERVICE COMMISSION OF THE CITY AND COUNTY OF SAN FRANCISCO, et al., will and does hereby move [for summary judgment] . . . ." Apparently gambling that this was a motion by a party no longer in the action, Harris filed opposition responding not on the merits, but only on the question of standing. Judge Garcia reached the merits, hearing argument from Harris on the merits, and ruled on the merits as well as on exhaustion grounds. Harris protests that the motion was never brought by the City and that the resulting order is void.

We concur with Judge Garcia's evident conclusion that the inclusion of "et al." was notice enough under the circumstances, especially given the deputy city attorney's dual representation of the defendants and given the substance of the motion, which went beyond the Commission's actions, to Muni's inability to control the examination process. Also, the City's concurrently filed separate statement, points and authorities, and related request for judicial notice *each* clearly identified the City (or both defendants) as having brought the motion.

Cal.Rptr. 303]; *Weary* v. *Civil Service Com.* (1983) 140 Cal.App.3d 189, 195-196 [189 Cal.Rptr. 442]; *Civil Service Com.* v. *Velez* (1993) 14 Cal.App.4th 115, 118-119 [17 Cal.Rptr.2d 490]) which required those three elements on an administrative appeal of a decision whether to adopt tests, a decision which, despite the individual concerns raised on the appeal, had a loud quasi-legislative ring to it.[2]

We will not decide that question, for Harris's first count lacks merit, even if properly reviewable under administrative mandate principles.

### *Administrative Mandate Fails on the Merits*

■ Administrative mandate tests a decision for abuse of discretion, defining this as (1) the agency not proceeding in the manner required by law, (2) the decision not being supported by its findings or (3) its findings not being supported by substantial evidence. (§ 1094.5, subd. (b).) Our review of any findings requires a deferential view of the record in their favor. (*Moran* v. *Board of Medical Examiners* (1948) 32 Cal.2d 301, 309 [196 P.2d 20]; cf. *Franz* v. *Board of Medical Quality Assurance* (1982) 31 Cal.3d 124, 135 [181 Cal.Rptr. 732, 642 P.2d 792].)

■ The Commission upheld cancellation of the tests and adopted the ruling of the Director based on a statistical analysis by staff of an adverse impact on African-American applicants. Harris makes no effort to attack that finding or its statistical underpinnings. In fact, when Judge Cahill asked at

---

[2]A brief public hearing was held on the afternoon of April 3, 1995, where several speakers expressed their views, pro and con, about the cancellation. However, the charter requires *all* regular meetings of the Commission to be "open to the public," with interested employees and members of the public given "an opportunity to be heard by the Commission before final action is taken in any case involving such person or persons" (S.F. Charter, § 10.100). That is what happened here.

"The fact that the administrative body acts in response to specific petitions or parties, and indulges in a hearing process, does not detract from the legislative nature of the action. [Citation.] Judicial review of a legislative or quasi-legislative action is made under ordinary mandamus (Code Civ. Proc., § 1085) and is limited to an examination of the proceeding to determine whether the action of an administrative body has been arbitrary, capricious, or entirely lacking in evidentiary support, or whether it has failed to give the notices and follow the procedures required by law. [Citations.]" (*Heist* v. *County of Colusa* (1984) 163 Cal.App.3d 841, 846 [213 Cal.Rptr. 278].) "Stated another way, the mere fact that a proceeding before a deliberative body may possess certain characteristics of the judicial process does not convert legislative action into an adjudication of a private controversy. [Citations.]" (*Joint Council of Interns & Residents* v. *Board of Supervisors* (1989) 210 Cal.App.3d 1202, 1211-1212 [258 Cal.Rptr. 762].) The ascertainment of facts as a basis for legislative action does not render the process judicial or anything less than quasi-legislative. (*Ibid.*) Nor does the making of findings. "Although a statutory obligation to make a 'finding' is a characteristic shared with adjudicatory proceedings, it does not stamp the function with an adjudicative character. [Citation.]" (*Ibid.*)

the hearing on the writ whether her counsel agreed that "the results of·this test disproportionately affected the African American test takers," counsel replied, "Yes, they did," insisting, however, that this finding "did not force the [Commission] to cancel the test[s]."

The tests should not have been canceled, Harris contends, because use of· the test results could ameliorate the effects of prior discrimination against another protected minority, of which she was a member. Accordingly, she would have us direct the Commission to effectively disregard the undisputed finding of manifest adverse impact upon African-Americans. However, it is undisputable that the Commission had ultimate discretion under the charter to devise, administer and assess the tests, and then to adopt or not adopt them or the tentative eligibe lists. ■ "[T]he action commanded [by mandate] cannot invade the area of discretion with which an administrative agency is vested over a given subject matter. [Citations.]" (*Sklar* v. *Franchise Tax Board* (1986) 185 Cal.App.3d 616, 622 [230 Cal.Rptr. 42].) ■ The undisputed finding of adverse impact was, on its face, a sufficient reason to exercise *discretion* to cancel the tests. Without in any way diminishing Harris's claims of discrimination and without relieving the Commission of its legal duties to investigate those claims, we are constrained from intruding within the ambit of the discretion vested in the Commission.

Harris contends the Commission was *bound as a matter of law* to preserve the tests, but her argument fails under a careful look at the FEHA and the federal precedent on which she relies. ■ "The objectives of the FEHA and title VII of the Federal Civil Rights Act (42 U.S.C. § 2000e et seq.) are identical and California courts have relied upon federal law to interpret analogous provisions of the state statute. [Citations.]" (*Walker* v. *Blue Cross of California* (1992) 4 Cal.App.4th 985, 997-998 [6 Cal.Rptr.2d 184].)

■ Proscribed discrimination comes in two forms. In " 'disparate treatment' " cases, the plaintiff alleges that an employer has treated *him or her* less favorably than others due to race, color, religion, sex or national origin, and the plaintiff must prove a discriminatory intent or motive. (*Watson* v. *Fort Worth Bank & Trust* (1988) 487 U.S. 977, 985-986 [108 S.Ct. 2777, 2784, 101 L.Ed.2d 827] (*Watson*).) In " 'disparate impact' " cases, by contrast, the plaintiff alleges and proves, usually through statistical disparities, that facially neutral employment practices adopted without a deliberately discriminatory motive nevertheless have such significant adverse effects on protected *groups* that they are "in operation . . . functionally equivalent to intentional discrimination." (*Id.* at pp. 986-987 [108 S.Ct. at p. 2785].) Cases challenging facially neutral tests, as Harris's does, fall within the disparate-impact category.

■ In this context, the federal high court has said: ". . . Title VII forbids the use of employment tests that are discriminatory in effect unless the employer meets 'the burden of showing that any given requirement [has] . . . a manifest relationship to the employment in question.' [Citation.] This burden arises, of course, only after the complaining party or class has made out a prima facie case of discrimination, *i.e.*, has shown that the tests in question select applicants for hire or promotion in a racial [or gender] pattern significantly different from that of the pool of applicants. [Citation.]" (*Albemarle Paper Co.* v. *Moody* (1975) 422 U.S. 405, 425 [95 S.Ct. 2362, 2375, 45 L.Ed.2d 280], fn. omitted, second brackets added.) If an employer succeeds in showing that a test having a disparate impact is " 'job related,' " then the burden shifts back to the plaintiff to show if she/he can, from the availability of alternatives or some other means of proof, that the test is a pretext for discrimination. (*Ibid.*)

**(1d)** Drawing upon these shifting burdens, Harris contends that while these tests had a disparate impact on African-Americans, the Commission had a duty under law to justify them by showing, under the uniform federal guidelines (29 C.F.R. pt. 1607 (1997)) as adopted in California for FEHA purposes (Cal. Code Regs., tit. 2, § 7287.4, subd. (a)), that the tests were sufficiently "job-related." Doing this through a so-called "validation study" was required, she insists, because canceling the tests had adverse impacts on other protected groups, most notably women, and the Commission thus had to try to preserve the tests to help correct a historical underrepresentation of women in Muni management and to prevent Muni from perpetuating that disparity through "temporary hires" of men. Judge Cahill thus did not go far enough, she urges, when he noted in his order denying mandate, "[T]here is no showing that, *by itself*, the cancellation of the test[s] discriminated against women." (Italics added.) She also highlights oral comments by the judge suggesting that he might have viewed adverse impact and job relatedness as mutually exclusive rather than compatible.

Several responses are needed. First, Harris's criticism of the judge's reasoning leads her nowhere. The record facts concerning adverse impact and job relatedness are undisputed, and only their legal effect is at issue. This means we are not bound on appeal by the judge's determinations (*Webb* v. *Miller* (1986) 187 Cal.App.3d 619, 625 [232 Cal.Rptr. 50]), and any asserted errors in his reasoning are immaterial to our review.

Next, Harris's argument that the Commission had a legal duty to use the test results ignores the guidelines which frame the standards for evaluating facially neutral selection criteria which may have discriminatory impact. "FEHC is authorized to interpret the Fair Employment and Housing Act by

adopting 'suitable rules, regulations, and standards.' (Gov. Code, § 12935, subd. (a)(1).) Here FEHC promulgated title 2, California [Code of Regulations], section 7287.4, subdivision (a) adopting the federal Uniform Guidelines on Employee Selection Procedures. (29 C.F.R. § 1607 et seq.) In 1978, the Equal Employment Opportunity Commission, the Civil Service Commission, the Department of Labor and the Justice Department jointly adopted the Uniform Guidelines to provide 'a framework for determining the proper use of tests and other selection procedures.' (29 C.F.R. § 1607.1[(A)].)" (*City and County of San Francisco* v. *Fair Employment & Housing Com.* (1987) 191 Cal.App.3d 976, 986, fn. 8 [236 Cal.Rptr. 716].)

Guidelines section 1607.3A (29 C.F.R. (1997)) provides that the use of a selection procedure which has an adverse impact on members of any race, sex or ethnic group "will be considered to be discriminatory and inconsistent with these guidelines, unless the procedure has been validated in accordance with these guidelines . . . ." The federal high court, cautioning that "employers are not required, even when defending standardized or objective tests, to introduce formal 'validation studies' showing that particular criteria predict actual on-the-job performance" (*Watson, supra,* 487 U.S. at p. 998 [108 S.Ct. at p. 2791]), also cited case law examples of safety-related prohibitions against methadone use and general tests which did not strictly predict ability at on-the-job tasks but did predict ability to master actual job-related training programs (*id.* at pp. 998-999 [108 S.Ct. at pp. 2790-2791]). The TM I and TM II tests which Harris took, however, were actual tests of skills and knowledge anticipated to be job-related and not just safety or success-predictor tests. It appears, then, that the Commission had no ready alternative to a formal validation study. Harris identifies no alternative and conceded at oral argument that no validation study was undertaken.

 Harris does rely on brief statements in the staff report reflecting that the tests were job-related, but her reliance is undercut by the guidelines. Section 1607.9A (29 C.F.R. (1997)), captioned "No assumption of validity," states: "Under no circumstances will the general reputation of a test or other selection procedures, its author or its publisher, or casual reports of it's [*sic*] validity be accepted in lieu of evidence of validity. Specifically ruled out are: assumptions of validity based on a procedure's name or descriptive labels; all forms of promotional literature; data bearing on the frequency of a procedure's usage; testimonial statements and credentials of sellers, users, or consultants; and other nonempirical or anecdotal accounts of selection practices or selection outcomes." In other words, under this guideline, no test having an adverse impact can be used absent a successful validation study.

The statements in the staff report are bald conclusions based on bare testimonials: "Both the subject matter expert who developed the examinations, and the candidates who participated in the examinations stated that the

written exercises were job-related and accurately measure the knowledge, abilities and skills necessary to perform the essential functions of the job. Thus, the second burden of proof as provided in the Guidelines was satisfied. . . ." This is exactly the kind of information the guidelines say cannot under any circumstances "be accepted in lieu of evidence of validity" (29 C.F.R. § 1607.9A (1997)). Even so, the dissent contends the staff report's "concession of job-relatedness" is sufficient to require the Commission to use the test results notwithstanding their undisputed discriminatory impact.

Harris concedes, and the Commission agrees, that these conclusions in the staff report do not constitute the kind of validation study required by the guidelines. Notwithstanding the efforts of the dissent, we also agree. A cursory overview of the guidelines shows that a validation study is a highly complex undertaking. Even when a test has been devised with close attention to the guidelines, a validation study involves a vast array of information and calls for choices among experts and a sensitive weighing of competing interests. (See, e.g., *Guardians Ass'n of New York City* v. *Civil Serv.* (2d Cir. 1980) 630 F.2d 79, 88-106; *Hamer* v. *City of Atlanta* (11th Cir. 1989) 872 F.2d 1521, 1532.) This is only fitting in view of the overarching purpose of the FEHA to eliminate discrimination, and since "job-relatedness" constitutes the sole exception under which a manifestly discriminatory test can be used.

■ Thus there was no legal duty in this case to adopt the tests or to try to validate them. The Commission had before it undisputed evidence of a dramatic disparate effect on African-Americans. (Cf. *City and County of San Francisco* v. *Fair Employment & Housing Com.*, *supra,* 191 Cal.App.3d 976, 987 [47.8% White passage; 18.18% Black passage].) This made validation a complex task and also increased the likelihood of a lawsuit, from the union or others, no matter what the outcome of the validation effort. The guidelines utilize a "four-fifths rule" (29 C.F.R. § 1607.4D (1997)) by which "[a] selection rate for any race, sex, or ethnic group which is less than four-fifths (4/5) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact . . . ." This guideline prescribes, in effect, a presumption of adverse impact, and hence a difficult obstacle to overcome.

The results of the TM I and TM II tests here showed selection rates of 48 and 50 percent for African-American women and 35 and 39 percent for African-American men, as compared with their White counterparts, a disparity far below the invalidity threshold of the four-fifths rule. The United States Supreme Court has stressed that the four-fifths rule is a mere rule of · thumb rather than a mechanical substitute for the required case-by-case

determination (*Watson, supra,* 487 U.S. at pp. 995-996, fn. 3 [108 S.Ct. at p. 2789]), but the disparity here was enormous, violating even a hypothetical "one-half rule."

Noting that African-Americans constituted 45 of 94 applicants taking the TM I test and 39 of 93 taking the TM II test, Harris tries to downplay the adverse impact by diverting attention from the tests, saying, "all of the evidence concerning Muni's past hiring practices indicates that, rather than being discriminated *against,* African-Americans in Muni management may actually have experienced discrimination in their *favor,*" and she cites statistics suggesting that African-Americans are in fact *over*represented in Muni management. The Commission, however, could not rely on such facts. The federal high court long ago rejected the notion that a "bottom line" showing of one group's adequate representation excuses an employment practice which has a discriminatory impact on them. "[T]he 'bottom line' does not preclude [an employee] from establishing a prima facie case, nor does it provide [the] employer with a defense to such a case." (*Connecticut v. Teal* (1982) 457 U.S. 440, 442 [102 S.Ct. 2525, 2528, 73 L.Ed.2d 130]; *Wards Cove Packing Co.* v. *Atonio* (1989) 490 U.S. 642, 653, fn. 8 [109 S.Ct. 2115, 2123, 104 L.Ed.2d 733].)

Similarly, had the Commission decided to use the tests while undertaking validity studies, it would have run a serious gamble. A guideline permitting such interim use in certain situations warns, ". . . If the study does not demonstrate validity, this provision . . . for interim use shall not constitute a defense in any action, nor shall it relieve the user of any obligations arising under Federal law." (29 C.F.R. § 1607.5J (1997).) The policy of deference to the proper exercise of adminstrative discretion dictates that an agency in the Commission's position cannot be forced by mandate to risk the expense, time and potential legal liability of a validation study.

What Harris really seeks is a rule requiring agencies to take affirmative action to ameliorate the discrimination which may have been inflicted upon one protected group by imposing a further disadvantage upon another protected group. Such a rule would be not only unwise but also impractical. In a diverse population like that of the San Francisco Bay Area, where the number of protected groups is large, many, if not most tests can be expected to significantly benefit one or more groups while having adverse impacts on others. Under Harris's proposed holding, every test would become an occasion for objections and court-compelled directives for affirmative action. The guidelines were not intended to impose new obligations with regard to affirmative action programs. "These guidelines . . . are not intended to impose any new obligations in that regard. . . ." (29 C.F.R. § 1607.13B (1997).)

The approach of our dissenting colleague, while different from Harris's, yields the same disquieting result. He advocates that any test which produces an adverse impact on one group—no matter how severe, apparently—demands that the agency try to validate the test whenever (1) some other group would be adversely affected by canceling it and (2) a staff review produces a first-impression opinion that the test was job related. This opens a bottomless pit. Condition (1), as we have already observed, will almost *always* occur within a diverse work force. Once a test has been given and scored, half the test takers can claim an "adverse impact" from its cancellation; and chances are, one or more of them will belong to another protected group. This might include, for example, White men—once an overrepresented majority but now a minority in an increasingly balkanized view of protected "groups." Condition (2) is a foregone conclusion except in those rare instances where some test criterion was arbitrary or irrational. At this advanced stage in the law's development, few if any employers would include such criteria. Also, any staff reviewing its own handiwork will be disinclined to deny it is job related. In effect, the dissent would deprive an administrative agency of the ability to excercise discretion in the battle against discrimination in employment.[3] We cannot endorse that view.

We hold that a court cannot, for the benefit of one protected group, compel a validation study through administrative mandate where an agency has properly exercised its discretion to cancel an employment test shown to have adverse impacts on another protected group.

By thus relieving the Commission from the duty to validate and utilize a plainly discriminatory set of tests, we expressly do not intend to relieve the Commission, or any other agency similarly situated, of its legal duties to investigate and eliminate discrimination. Our holding is not intended to preclude an employee from bringing an action under the FEHA which might investigate the full picture of practices claimed to be discriminatory. Harris has in fact brought such an action in federal court, where she challenges the cancellation of these tests not in isolation, but as part of broad-ranging

---

[3]We stress also on this record that the staff report's conclusion of job relatedness was contradicted by a speaker at the Commission hearing, test-taker Peter Der, who argued that the test "punishe[d]" those with actual experience as supervisors and was "not job-related." He illustrated his point (in the brief three minutes allotted him) by explaining why the official answer to one test question on staffing and overtime was simply "wrong." The Commission inferentially relied in part on his testimony in deciding not to defend the tests (cf. *City and County of San Francisco* v. *Fair Employment & Housing Com., supra,* 191 Cal.App.3d 976, 990), and this raises a vexing question: How strong must the initial showing of job relatedness be before the dissent believes an agency is compelled, as a matter of law, to attempt validation? The equivocal record here is not enough, in the dissent's view, to vest the agency with any discretion in the matter.

allegations of long-standing and pernicious discrimination against women.[4] Our holding only prevents comprehensive complaints of ongoing discrimination from being hitched to complaints seeking the more narrowly framed and relatively summary remedy of administrative mandate in circumstances where an agency has canceled obviously discriminatory tests having demonstrated adverse impacts.

It necessarily follows that an agency's decision to jettison such plainly objectionable tests, standing alone, will not ordinarily be considered discriminatory. However, we acknowledge that case law does hold that in a title VII action, "practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." (*Griggs* v. *Duke Power Co.* (1971) 401 U.S. 424, 430 [91 S.Ct. 849, 853, 28 L.Ed.2d 158] [diploma requirement or standardized intelligence tests as affecting Blacks].) While this ordinarily applies in a challenge to the *use* of a test, one case cited by Harris has extended the rationale to require scrutiny of such a test being canceled.

In *Giles* v. *Ireland* (11th Cir. 1984) 742 F.2d 1366 (*Giles*), a three-step system of promotion for mental health workers was found violative as freezing a discriminatory status quo when a moratorium was placed on promotion from only the lowest category, comprised of two-thirds Black workers, and the top level was comprised of only 5 percent Black workers. (*Id.* at p. 1369.) The freeze in promotions disproportionately affected Blacks, who "were concentrated in the lowest level positions [at a state hospital] as a result of past discrimination." (*Id.* at p. 1380.) The case is distinguishable. First, the past history of racial discrimination—disparate

---

[4]At the City's request, we have taken judicial notice of a complaint filed by Harris in federal district court in July 1997, while this appeal was pending. It is a title VII action under the Federal Civil Rights Act (42 U.S.C. § 2000e et seq.) brought against the City, and it alleges a long-standing history of unlawful employment practices effected by the City, through Muni, including sex discrimination and retaliation. The test cancellation challenged in our state action is listed as just one of nine challenged practices. Related practices are alleged failures to maintain current eligibility lists and failure to extend old ones, and the requested relief includes not only validation of the 1992-1993 test results at issue here, but immediate appointment of Harris to an "acting" TM II position plus injunctive relief against future discrimination, for herself and other women. We have also judicially noticed her related administrative complaint with the DFEH and the Equal Employment Opportunity Commission, in which she details as discriminatory acts each of the nine practices she challenges in the federal action.

Were there salvageable components in her administrative mandate count, we would be inclined to do as Division Five of this district did a decade ago, in a similar situation, and defer action to the federal court, where the same allegations are raised as part of a comprehensive challenge. (*City and County of San Francisco* v. *Fair Employment & Housing Com.*, *supra,* 191 Cal.App.3d 976, 993-994.)

treatment, not just disparate impact—had already been established in prior litigation (*id.* at pp. 1369-1370); second, the plaintiffs in the current action had challenged "a full range of allegedly discriminatory employment practices" at the hospital (*id.* at p. 1369); third, the cancellation was partial, leaving a disparate impact from other tests.

This case, by contrast, is not a follow-on matter (cf. *U.S.* v. *City and County of San Francisco* (N.D.Cal. 1987) 656 F.Supp. 276, 285-286 [issue remained whether a cancellation of test and resulting freeze of hiring and promotions, for found adverse impact, had the effect of perpetuating past discrimination as found in a prior action]), or one in which the scope of allegations and relief extends beyond the one test cancellation (cf. *id.* at p. 285, fn. 7 [trial court might yet find the cancellation discriminatory "in the context of plaintiff-intervenors' much broader pattern and practice allegations"]), or one of partial cancellation (cf. *id.* at pp. 284-285 [cancellation-caused total freeze did not have a disparate impact on one group, as identified in *Giles*]).

We also distinguish, of course, the typical case where a challenge is to the *use*—not cancellation—of a test with adverse impacts (*Dothard* v. *Rawlinson* (1977) 433 U.S. 321, 323-331 [97 S.Ct. 2720, 2723-2728, 53 L.Ed.2d 786] [minimum height and weight requirements affecting women]; *Albemarle Paper Co.* v. *Moody, supra,* 422 U.S. 405, 428-429 [95 S.Ct. 2362, 2376-2377] [verbal intelligence tests affecting Blacks]). Such tests serve to illustrate the role of formal validation of "job-relatedness" as an exception to the general prohibition of discrimination. The exception is available to an employer who seeks in good faith to justify an adverse impact upon a protected group, but its burden can neither be undertaken inadvertently nor lessened to the point where minimal evidence will suffice, as is suggested by the dissent. Certainly, an unwilling employer cannot be required by administrative mandate to shoulder the burden of such justification in the face of undisputed evidence of discrimination.

Administrative mandate was properly denied.

### DISPOSITION

The judgment is affirmed.

Kline, P. J., concurred.

**HAERLE, J.,** Concurring and Dissenting.—I concur with majority in its holdings regarding counts II and III of appellant's complaint on the ground it specifies, namely, that appellant sued the wrong party in these counts.

I respectfully dissent, however, from the majority's disposition of count I, the administrative mandamus count. In the first place, I believe the trial court made a fundamental error of law in the course of adjudicating count I. Second, I disagree with the majority's dicta implying that administrative mandamus does not lie because the agency was exercising a "quasi-legislative" function. Third, I would hold that respondent San Francisco Civil Service Commission (CSC) abused its discretion by canceling the promotional tests when, as here, (1) that cancellation adversely impacted another protected minority, (2) the staff report it commissioned and ended up approving (hereafter Brady report) declared so unequivocally that the tests were "job-related," and (3) the cancellation was so patently the result of pressures by the union representing the status quo.

I will deal with these issues in the order just noted.

## A. *The Trial Court Misapplied the Law Concerning Count I*

First of all, I believe the record makes clear that the trial court made an error of law in disposing of count I. This is a recognized basis for reversal of a trial court's decision in a Code of Civil Procedure section 1094.5 (hereafter section 1094.5) action. (See *Magit* v. *Board of Medical Examiners* (1961) 57 Cal.2d 74, 87 [17 Cal.Rptr. 488, 366 P.2d 816]; *Webb* v. *Miller* (1986) 187 Cal.App.3d 619, 624 [232 Cal.Rptr. 50]; see also Cal. Administrative Mandamus 2d (Cont.Ed.Bar 1989) § 14.24, pp. 460-461.)

The error of law that is, I believe, plain from the record is that the superior court judge, who heard the administrative mandamus petition, quite apparently thought the sum total of the issue before the CSC at its hearing on April 3, 1995, was whether the tests had an adverse impact on African-Americans. This was incorrect. There were clearly two issues: (a) was there an adverse impact upon a cognizable class of persons, and (b) if so, were the examinations nonetheless "job-related"? That this is a two-prong test is made clear in the applicable California regulations. Thus, under California Code of Regulations, title 2, section 7287.4, subdivision (a), a showing of an adverse impact makes the practice "unlawful *unless* the policy or practice is job-related . . . ." And under title 2, section 7287.4, subdivision (e), if the "testing device" has an "adverse impact," it is then "permissible *only upon a showing* that the selection practice is sufficiently related to an essential function of the job in question to warrant its use." (Italics added.)

It is, I suggest, patent from these passages that adverse impact and job relatedness are two separate and distinct issues. This conclusion is fortified by a decision from Division Five of this district, *City and County of San*

*Francisco* v. *Fair Employment & Housing Com.* (1987) 191 Cal.App.3d 976 [236 Cal.Rptr. 716]. There, citing two United States Supreme Court cases, Justice Haning wrote: "Once the racially adverse impact of the examination was established, the burden of proof shifted to the City to prove the examination job-related." (*Id.* at p. 989.)[1]

But that, clearly, is not how the trial court understood matters during the September 1997 hearing in front of it. At several different points during oral argument by appellant's counsel, the judge made plain that, in his view, all that was necessary to sustain the action of the CSC in canceling the tests was the (admitted) fact that the written part of the test adversely impacted African-Americans. Thus, at one point, after appellant's counsel had pointed out that the CSC staff had made an "undisputed admission that the test was job related," the judge asked: "How can it have adverse impact and be solely job related?" At another point, after the same counsel argued that one "can't say well, because a test had adverse impact, therefore, probably it wasn't job related," the judge asked: "Why can't you do that?"

It is thus obvious that the judge thought he was dealing with a single-factor test, i.e., was there an adverse impact on a protected class? Once that question was answered affirmatively (as it clearly was here), he apparently concluded he could not find that the administrative agency abused its discretion. In fact, as we have seen, the regulations and cases make clear that what is involved is a two-prong test. The trial court should have gone on to examine whether there was anything in the record to establish whether or not the tests were job-related.[2] Because it did not do so, I conclude that it erred on an issue of law, requiring us to reverse.

## B. *Administrative Mandamus Was Appropriate*

In two brief paragraphs in its opinion (maj. opn. *ante,* at pp. 363-364) the majority suggests although it admittedly does not decide that count I may be deficient because it attacks administrative action which is essentially "quasi-legislative" as opposed to "quasi-judicial." I disagree with the majority's dicta.

First of all, it is noteworthy that the respondents did not raise this issue in support of the outcome below. Nowhere in their briefs is their the slightest

---

[1]Of course, under title VII of the Federal Civil Rights Act (42 U.S.C. § 2000e et seq. (hereafter title VII)) it has long been clear that there are two prongs to the test. (See, e.g., *Griggs* v. *Duke Power Co.* (1971) 401 U.S. 424, 436 [91 S.Ct. 849, 856, 28 L.Ed.2d 158], and *Albemarle Paper Co.* v. *Moody* (1975) 422 U.S. 405, 425 [95 S.Ct. 2362, 2375, 45 L.Ed.2d 280].)

[2]As I will explain in more detail below, it should especially have done so here because the Brady report presented to the CSC concluded the tests were almost certainly "job-related."

mention of the agonizingly arcane dichotomy between "quasi-legislative" and "quasi-judicial" actions of administrative agencies. Nor was the point raised in oral argument by respondents.

But, second, and mindful of the refrain that appellate courts may affirm "on any basis presented by the record," I disagree with the suggestion of the majority as to the proper characterization of this administrative action. The difference between "quasi-legislative" and "quasi-judicial" functions of an administrative agency is explored thoroughly in two leading texts. (See 8 Witkin, Cal. Procedure (4th ed. 1997) Extraordinary Writs, §§ 268, 269, pp. 1067-1071; Cal. Administrative Mandamus, *supra*, § 1.17, pp. 18-20 and § 3.11, pp. 81-82.) The appellate decision which most helpfully discusses the distinction is *Pacifica Corp.* v. *City of Camarillo* (1983) 149 Cal.App.3d 168, 176-178 [196 Cal.Rptr. 670]. That case stands for the proposition that when the administrative proceedings implicate the "application of specific standards to existing facts" (*id.* at p. 176), they are quasi-judicial. Indeed, a review of the authorities characterizing action as "quasi-legislative" reveals almost all of them to be cases involving an agency's adoption of rules, regulations, guidelines, etc.

By contrast, what was involved here was an appeal by five individuals who complained that the cancellation of the tests violated the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.) and the regulations issued under it, and hence discriminated against them as members of an under-represented group. Indeed, the Brady report to the CSC summarized the issue before that agency as follows: "Five candidates, four of whom placed at or near the top of the two eligible lists, appealed the decision of the Director to cancel the examinations to the Civil Service Commission: . . . [¶] . . . Two of the appellants [including this appellant] contend that they are members of under-represented groups in the management level of MUNI and they would be further adversely affected by nullifying the examination."

I respectfully submit there is no reasonable way the resolution of such an issue can possibly be characterized as "quasi-legislative."

C. *The Agency Abused Its Discretion by Canceling the Promotional Tests*

I do not understand the majority to contest the proposition that if, as and when an administrative agency abuses its discretion in a quasi-adjudicative setting, relief under section 1094.5 is available. (See *Quackenbush* v. *Mission Ins. Co.* (1996) 46 Cal.App.4th 458, 466 [54 Cal.Rptr.2d 112]; *Saleeby* v. *State Bar* (1985) 39 Cal.3d 547, 562 [216 Cal.Rptr. 367, 702 P.2d 525]; see

generally, 9 Witkin, Cal. Procedure, *supra,* Administrative Proceedings, § 114, pp. 1158-1159.) Nor, in turn, do I contest the fact that the record made before this administrative agency demonstrated that the examinations in question, particularly the written part, had an adverse impact upon African-Americans.[3]

As noted at the beginning, I part company with the majority because of three circumstances which I believe they do not adequately weigh: (1) the adverse impact of the cancellation upon another protected minority, women, (2) the effectively-conceded "job relatedness" of the tests in question, and (3) the fact that, when confronted by union pressure to cancel the examinations, the CSC effectively eschewed any exercise of discretion.

### 1. *Adverse Impact via Test Cancellation*

The appellant here claims, and claimed before the trial court in her mandamus hearing, that she was adversely impacted by the cancellation of the tests. Although the point is well buried in two federal cases decided under title VII, I think it is nevertheless clear that employment-related action such as canceling promotional tests or "freezing" promotional lists may be the sort of acts which trigger that federal statute and, a fortiori, the FEHA. (Cf. *U.S.* v. *City and County of San Francisco* (N.D.Cal. 1987) 656 F.Supp. 276, 283-285; *Giles* v. *Ireland* (11th Cir. 1984) 742 F.2d 1366, 1376-1378.)

Clearly, women are a protected class under the FEHA. (See Gov. Code, §§ 12920, 12940.) More importantly, I believe that appellant, in her mandamus papers to the trial court, made out a prima facie case of at least adverse impact caused by the cancellation of the examinations. This prima facie case rested principally on the fact that women were and are underrepresented in the management ranks of San Francisco's Municipal Railway (Muni).

As already noted, the Brady report squarely presented appellant's "under-represented group" issue to the CSC. As I have also suggested, I believe the record shows that her contention had at least a prima facie basis. She

---

[3]The majority suggests that, because a particular federal guideline (29 C.F.R. § 1607.4D (1997)) declares that an 80 percent or lower passage rate by a particular ethnic group "will generally be regarded by the Federal enforcement agencies as evidence of adverse impact," this means there is then "a presumption of adverse impact." (Maj. opn., *ante,* at p. 1368.) In the first place, that is not what the federal regulation says. Second, I question the need to look to federal regulations when there are two California regulations directly on point. (See Cal. Code Regs., tit. 2, § 7287.4, subds. (a) and (e).)

presented to the superior court[4] evidence showing that the present Muni management at the pertinent levels is composed of only 6 percent women (2 out of 33) as compared with a universe of the total "available labor pool" in the San Francisco Bay Area of approximately 46 percent. And, according to more general figures supplied by the Muni itself, as of 1994 it had "unrealized goals" of between 15 percent and 47 percent of women in overall management, professional and supervisory roles. Finally, appellant also produced evidence that, prior to the cancellation of the tests in December 1994, the next most recent promotional lists for the position for which she tested expired as of 1989 and 1990. Thus, the cancellation of the tests on which appellant scored so well allowed Muni management to fill the positions she sought on a "temporary appointment" basis. Which, of course, is exactly what happened: after the cancellation, *all of them men and two of them African-American,* were appointed to fill the vacancies which were supposed to be filled via the canceled tests.

I submit that, on this record, appellant had established at least a prima facie case of adverse impact by the nullification of the tests.

## 2. *Job Relatedness*

It is on this issue that I principally part company with the majority's reasoning. My colleagues seem to feel that the absence of a formal "validation study" regarding the test means that the test cannot be "job-related." I profoundly disagree, and for several reasons.

First of all, the whole "validation study" business is strictly a creature of federal regulations adopted under title VII. Some of part 1607· of title 29 of the Code of Federal Regulations (1997) posits a long and involved process by which employment tests and the like may be "validated" and hence be absolutely, positively, etc., found to be job related. But no California case, no California statute, and not even any California regulation says that an employment test has to undergo anything like the tortuous, bureaucratically created process envisioned by section 1607. To be sure, California Code of Regulations title 2, section 7287.4, subdivision (a) says that an employment policy or practice (including, of course, a test) which has an adverse impact on a protected group is unlawful "unless the policy or practice is job-related, as defined in Section 7287.4(e). The [Fair Employment and Housing] Commission herein adopts the *Uniform Guidelines on Employee Selection Procedures* promulgated by various federal agencies, including the EEOC and Department of Labor."

---

[4]It is unclear to me, from the record as presented to us, whether these same statistics were before the CSC.

I do not understand the Fair Employment and Housing Commission's (FEHC) "adoption" of the federal guidelines to mean that the latter's long and complex "validation" study process is thus incorporated into California law, much less incorporated as the exclusive means of establishing "job-relatedness." Note that California Code of Regulations title 2, section 7287.4, subdivision (a) says that the term "job-related" is as defined in section 7287.4, subdivision (e). When one looks at that section, one finds the definition to be: ". . . that the selection practice is sufficiently related to an essential function of the job in question to warrant its use." (*Ibid.*) I think it is very clear that if the latter is shown, i.e., that the test being challenged is "sufficiently related to an essential function of the job," it is enough to mean, at least prima facie anyway, that it is job related.

Second, the United States Supreme Court has itself made clear that a formal "validation study" is not, even under title VII and section 1607 (29 C.F.R. (1997)) of the federal regulations, at all mandatory to a finding of job relatedness. As the majority concedes, in *Watson* v. *Fort Worth Bank & Trust* (1988) 487 U.S. 977, 998-999 [108 S.Ct. 2777, 2791, 101 L.Ed.2d 827], a plurality of the court speaking through Justice O'Connor held exactly this, stating: "Our cases make it clear that employers are not required, even when defending standardized or objective tests, to introduce formal 'validation studies' showing that particular criteria predict actual on-the-job performance. In [*New York City Transit Authority* v.] *Beazer* [(1979) 440 U.S. 568 [99 S.Ct. 1355, 59 L.Ed.2d 587]], for example, the Court considered it obvious that 'legitimate employment goals of safety and efficiency' permitted the exclusion of methadone users from employment with the New York City Transit Authority; the Court indicated that the 'manifest relationship' test was satisfied, even with respect to non-safety-sensitive jobs, because those legitimate goals were 'significantly served by' the exclusionary rule at issue in that case even though the rule was not required by those goals. [Citation.] Similarly, in *Washington* v. *Davis* [(1976) 426 U.S. 229 [96 S.Ct. 2040, 48 L.Ed.2d 597]], the Court held that the 'job relatedness' requirement was satisfied when the employer demonstrated that a written test was related to success at a police training academy 'wholly aside from [the test's] possible relationship to actual performance as a police officer.' [Citations.] ('[A]s a matter of law, it is permissible for the police department to use a test for the purpose of predicting ability to master a training program even if the test does not otherwise predict ability to perform on the job')."

Citing *Watson*, two federal district courts have ruled that a formal validation study is *not* a prerequisite to a finding of job relatedness. (See *Garner* v. *Runyon* (N.D.Ala. 1991) 769 F.Supp. 357, 362; *Rudder* v. *District of Columbia* (D.D.C. 1995) 890 F.Supp. 23, 45, fn. 14.) If, notwithstanding section

1607 (29 C.F.R. (1997)) of the federal regulations, a "validation study" is not necessary to establish "job-relatedness," a fortiori it is not in California under the FEHA and the FEHC's regulations.[5]

The third and final reason why job relatedness should have, at least, been further explored by the CSC, and perhaps even found on the record before it, derives from the refreshingly candid Brady report presented to that agency in advance of its hearing on the complaint of appellant and her several colleagues. That report was prepared by one Terri Brady, who also testified at the beginning of the CSC hearing on April 3, 1995. In a six-page, single-spaced report to the CSC, Brady set out the background of the controversy coming before that body. In describing the tests that had been given, she preliminarily observed that, although "time-consuming and costly to develop and administer," they nonetheless "tested the required knowledge areas, abilities and skills needed to perform the essential functions of the positions."

That bit of prose might, to a layman, seem to concede job relatedness, but there is, as the majority itself notes, much more. A couple of pages later, under the heading of "Standards," and after noting in considerable statistical detail how the written part of the tests adversely impacted African-American applicants, the Brady report took up the job relatedness issue: "The second burden of proof cited in the [federal] Uniform Guidelines pertains to the job-relatedness of the examinations. . . . Both the subject matter expert who developed the examinations, and the candidates who participated in the examinations stated that the written exercises were job-related and accurately measured the knowledge, abilities and skills necessary to perform to essential functions of the job. *Thus, the second burden of proof as provided in the Guidelines was satisfied.*" (Italics added.)

Citing a portion of the federal guidelines, the majority dismisses this concession of job relatedness as not binding because of the sources relied upon.[6] But the critical point is not whether that statement is a binding legal admission, *but whether CSC's utter disregard of its essence constitutes an*

---

[5]The majority states that "under this guideline [29 C.F.R. § 1607.9A (1997)], no test having an adverse impact can be used absent a successful validation study." (Maj. opn., *ante*, at p. 1367.) That is, I respectfully suggest, patently contrary to the unequivocal holding of *Watson.* It is not clear to me whether the majority is (a) interpreting that case as saying something different than is conveyed by its clear language or (b) laying down a stricter standard for FEHA purposes than obtains under title VII.

[6]At another point, the majority deprecates the Brady report's conclusion regarding job relatedness as a "first-impression opinion" which is a "foregone conclusion" because the staff is assessing "its own handiwork." (Maj. opn., *ante*, at p. 1370.) I respectfully submit that these characterizations are quite unfair; such is apparent from the conscientiousness and candor which literally pervades the report. Also, and although not demonstrable from the report

*abuse of discretion.* I conclude it does. Put another way, I maintain the Brady report's statements mean, at the minimum, that the examinations were *presumptively job related.* I would hold that, in light of them, the CSC was at least required to take the job relatedness issue to the next level of inquiry, i.e., to (a) undertake a formal "validation study" (or its equivalent) and (b) then make a definitive determination as to whether the tests were job related.

### 3. *Union Pressure*

And why didn't it do so? Because, very probably, of political pusillanimity. As made manifest by Brady in both her report and her CSC testimony, the union representing the current occupants of Muni supervisory and management positions, Transport Workers Union, Local 200 (Local 200), wouldn't hear of it.

After, as noted above, the Brady report came down hard and fast on the job relatedness point, it went on to conclude that such was not the end of the inquiry. It said that there was yet a "third burden of proof" which could be "the determining factor when deciding to use or nullify these examinations," namely whether there are "alternate tests or comparable selection devices that are job-related but do not evidence adverse impact."[7] It noted that the staff had considered this possibility and, indeed, during a meeting with Local 200 had "recommended either a broader certification rule or even [a] rule of the list certification procedures be employed to resolve the issue." (The report explained this meant that a larger number of persons who took and passed the tests could be considered under this compromise solution.)

But the compromise went nowhere and the Brady report explains why: "This proposed resolution to the protest would have satisfied the third burden of proof as the Guidelines stipulate. *However, Local 200 would not agree to broadening the certification rule and dismissed this proposed resolution out of hand.*" (Italics added.)

The Brady report then explained once more why the "broadening of the certification rule" solution was fair and equitable, but then noted again:

itself, I strongly suspect that the final characterization is simply wrong for the reason that personnel experts are probably not entrusted with the substance of examinations to, e.g., test who would be a good San Francisco Muni supervisor.

[7]Query whether such a "third factor" exists in California law. It is nowhere mentioned in the applicable regulation (Cal. Code Regs., tit. 2, § 7287.4), although it is in the federal guidelines. (See 29 C.F.R. § 1607.3B (1997).) The only California case I have found mentioning it suggests it applies only if the employment device under scrutiny is a "mere pretext." (See *City and County of San Francisco* v. *Fair Employment & Housing Com., supra,* 191 Cal.App.3d at p. 985.)

"However, Local 200 stated they would not accept broadening the rule of certification and insisted the lists be nullified."

That effectively ended the staff's search for a resolution. The Brady report then concluded with this frank summary: "The Uniform Guidelines on Employee Selection Procedures issued by the Federal government dictate that selection procedures be job-related and free of adverse impact.[8] Given the prima facie case of statistically significant differing rates of passage on the written components of both . . . examinations, *and given the limitations placed on the use of alternate selection devices,* the Director acted appropriately in nullifying these examinations." (Italics added.) The italicized portion of this summary "says a mouthful."

Ms. Brady appeared before the CSC on April 3, 1995, to formally present her report and this recommendation. She reiterated the attempted compromise she and her staff had tried to reach with Local 200 to try to effect "a mutually satisfactory resolution to the problem" by "broadening the rule of certification for these lists . . . ." But, she again noted: "Local 200 did not agree to this compromise and stated that the only solution that was acceptable to them was to have the examination list nullified." With practically no discussion among its members, the CSC voted to accept this staff recommendation.

From all of this, I believe it is obvious that Local 200's adamant opposition to any compromise regarding "comparable selection devices" was the dominant factor in the ultimate cancellation of the tests. Put another way, the CSC simply turned "toes up" in the face of the union's pressure and never even considered exercising any discretion in this matter.[9] Such a well-documented refusal of an administrative agency to exercise its discretion necessarily makes its ultimate action "arbitrary, i.e., unsupported by a

---

[8] Not, as we have seen, quite correct: The correct formulation is that, unless they are free of adverse impact, they must be job related.

[9] To my dismay, the majority seemingly approves this exercise in timidity. It says that attempting validation "increased the likelihood of a lawsuit, from the union or others" (maj. opn., *ante*, at p. 1368) while crediting the test results and simultaneously undertaking a validity study would also "have run a serious gamble." (*Id.* at p. 1369.) It concludes: "[D]eference to the proper exercise of administrative discretion dictates that an agency in the Commission's position cannot be forced by mandate to risk the expense, time and potential legal liability of a validation study." (*Ibid.*) I regret seeing such sentiments expressed as potential legal precedent. They seem to me to say that the "cut and run" exercise pursued here by the CSC is defendable because such bodies shouldn't be forced to (a) decide what is right and (b) defend that decision in court. I had always thought that was generally the best public policy.

rational basis" and thus an abuse of discretion. (See *In re Executive Life Ins. Co.* (1995) 32 Cal.App.4th 344, 358 [38 Cal.Rptr.2d 453].)[10]

The majority holds that "[t]here was no legal duty in this case to adopt the tests or to try to validate them." (Maj. opn., *ante*, at p. 1368.) It sums up its holding as being that "a court cannot, for the benefit of one protected group, compel a validation study through administrative mandate where an agency has properly exercised its discretion to cancel an employment test shown to have adverse impacts on another protected group." (*Id.* at p. 1370.) I would hold, to the contrary, that it was an abuse of discretion for this agency to decline to undertake a validation study inasmuch as (1) the cancellation of the tests had an apparent adverse impact upon another protected minority, (2) the tests were presumptively job related as per the agency's staff's own thorough investigation and analysis, and (3) the agency clearly declined to pursue a "comparable selection device" alternative because of union pressure.

For these reasons, I respectfully dissent from the majority's affirmance of the trial court's denial of appellant's petition for a writ of administrative mandamus. I would reverse as to that count and remand it to the trial court for further proceedings consistent with the foregoing.

Appellant's petition for review by the Supreme Court was denied October 28, 1998.

---

[10]I note with regret that the majority nowhere deals with, or even refers to, the obviously severe impact of Local 200's obstinacy in this controversy.